UNITED STATES DISTRICT COURT
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED

03 JUN 10 PM 3: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

**BELLSOUTH INTELLECTUAL PROPERTY,**　　　　]
　　　　　　　　　　　　　　　　　　　　　　]
　　　　Plaintiff(s),　　　　　　　　　　　]
　　　　　　　　　　　　　　　　　　　　　　]
　　　　vs.　　　　　　　　　　　　　　　　] CV 00-CO-03743-S
　　　　　　　　　　　　　　　　　　　　　　]
**BEAR CREEK TECHNOLOGIES, INC.,**　　　　 ]
　　　　　　　　　　　　　　　　　　　　　　]
　　　　Defendant(s).　　　　　　　　　　　]

**ENTERED**

JUN 1 0 2003

I.　　**Introduction**

　　　　This is an action for breach of contract brought pursuant to the Court's diversity

jurisdiction, 28 U.S.C. § 1332. It is before the Court on the plaintiff's motion for summary

judgment on its claims against the defendant for monies owed under a license agreement,

and by the plaintiff as the counter-defendant on Defendant's counterclaims for fraudulent

suppression, breach of warranty, breach of oral contract, and tortious interference with

business relations. (Doc. #75 and #76). The issues have been briefed by both parties and

are now ripe for review.[1] For the reasons set forth below, Plaintiff's Motion for Summary

Judgment is due to be **GRANTED** in part and **DENIED** in part.

---

[1]The court notes that parties submitted two different sets of briefs. The case has traversed through the
courtrooms of Judges Acker, Bowdre, and Clemon, and the initial set of summary judgment briefs were submitted
according to Judge Bowdre's requirements. (Docs. # 75, 76, 78- 81, and 84-86). After the case was transferred to
this court, the court initially issued an order stating that summary judgment was denied. (Doc. #94). BST moved
for reconsideration and the court allowed an additional set of briefs. (Doc. #99). The way the parties addressed
certain issues varied among the briefs and the court has tried to note these differences when possible.

## II.    Statement of Facts

### a.    Initial Written Agreements

Plaintiff BellSouth Intellectual Property Marketing Corporation ("BIPMARK") is a Georgia corporation with its principal place of business in Atlanta, Georgia. It is engaged in the business of marketing intellectual property for its parent telecommunications company, BellSouth Telecommunications Corporation ("BST").[2] Defendant Bear Creek Technologies, Inc. ("Bear Creek") is a Delaware corporation with its principal place of business in Birmingham, Alabama. It develops and markets software products and technological services. Bear Creek does not possess any offices or other property in the state of Georgia and does not have employees in Georgia. It is not registered to do business in that state. At its peak, Bear Creek employed approximately 100 employees. Its founder and chief executive officer was Joe Thompson ("Thompson").

BST uses a vast network of poles, lines and other equipment to provide its services, collectively called the "outside plant." The company once used a largely manual process to manage construction projects but in the early 1990s, began developing a software program called Outside Plant Construction Management ("OSPCM") to automate this process and administer the scheduling, bidding, construction, inspection, and payment of outside plant construction jobs. BST developed OSPCM internally in two development phases. Phase I dealt with buried service wire and Phase II dealt with all other aspects of outside plant construction and was by far the larger model. BST employees, Jim White ("White"), David Brogdon ("Brogdon"), and Terry Small ("Small") were involved in the

---

[2]The opinion will refer to the plaintiff collectively as BST for purposes of simplification.

development, planning and construction of OSPCM. Brogdon and White were later hired by Bear Creek. White began work for BST in 1962 and was involved with the OSPCM project from its outset until his retirement from the company on October 31, 1996. Brogdon was in charge of the OSPCM group and reported to Jim White. He had formerly been in charge of the systems that preceded and served as a foundation from which OSPCM was designed and built.

In 1994, Bear Creek had a contract to provide programmers to BST. Bear Creek hired Brogdon in 1995; he initially worked for the company as a salesman for TrafficWise, a software application that measured traffic on telephone networks. Brogdon approached BST in 1996 to obtain permission to sell licenses for OSPCM. In response to Bear Creek's overtures, BST entered into negotiations with Bear Creek over the terms of a license agreement that would allow Bear Creek to sublicense OSPCM to third parties. The final agreement reflected concerns presented by both sides; it was for four years rather than the two year term proposed by BST and BST rejected offers to make it an exclusive arrangement. (Doc. #106, Dep. Thompson, pp. 39-44). At the time the parties negotiated the contract, they knew that OSPCM was not fully developed. (Doc. #106, Dep. Thompson, p. 50). The final agreement includes several provisions which are relevant to this action:

At paragraph 3.02, the License Agreement states

> In consideration of the rights granted hereunder, Licensee will market the Materials to Customers and will devote adequate resources, including professional, trained personnel, to fulfill its obligations hereunder for the term hereof. *This is a nonexclusive contract, and BST may enter into similar agreements with others and may market the Materials itself.*
> (Emphasis added).

3

(Doc. #111, Exh. 1, Def. Exh. 1).

At paragraph 7.01, BST expressly disclaims any warranties:

> BST does not and shall not offer any warranty of any kind for the Materials to Licensee, its Distributors, any customer of Licensee, any Customer of a Distributor or any other person or entity. Any warranty obligation set forth in a Customer's agreement with Licensee or with a Distributor with regard to the Materials shall be undertaken solely by Licensee or the distributor. THE MATERIALS ARE PROVIDED "AS IS" AND BST MAKES NO REPRESENTATIONS OR WARRANTIES TO LICENSEE OR DISTRIBUTORS, LICENSEE'S CUSTOMERS OR CUSTOMERS OF A DISTRIBUTOR WITH REGARD TO THE PERFORMANCE OF THE MATERIALS OR THEIR CONFORMANCE WITH APPLICABLE SPECIFICATIONS OR DOCUMENTATION. ALL WARRANTIES WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED, WAIVED AND EXCLUDED.

(*Id.*).

Paragraph 9 contains a waiver of liability:

> BST SHALL NOT BE LIABLE TO LICENSEE CONSULTANTS, DISTRIBUTORS, CUSTOMERS OR TO ANY PERSON OR ENTITY USING THE MATERIALS IN WHOLE OR IN PART, OR TO ANY PERSON OR ENTITY TO WHOM LICENSEE OR A DISTRIBUTOR FURNISHES THE MATERIALS OR SERVICES FOR LOSS OF REVENUES, LOSS OF PROFITS, LOSS OF TIME, INCONVENIENCE, LOSS OF USE, OR FOR ANY OTHER INCIDENTAL, SPECIAL, DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE ARISING OUT OF THIS AGREEMENT OR ANY OBLIGATION RESULTING THEREFROM, OR THE USE OR PERFORMANCE OF THE MATERIALS, IN WHOLE OR IN PART, WHETHER IN AN ACTION FOR OR ARISING OUT OF ALLEGED BREACH OR WARRANTY, ALLEGED BREACH OF CONTRACT, DELAY NEGLIGENCE, STRICT TORT LIABILITY OR OTHERWISE. THIS CLAUSE SHALL SURVIVE FAILURE OF AN EXCLUSIVE REMEDY.

(*Id.*).

4

Regarding the substantive terms of the agreement, it obligated Bear Creek to "market the [software] to customers" and "devote adequate resources, including professional, trained personnel, to fulfill its obligations [under the Agreement] for the term hereof." (*Id.*). The parties anticipated Bear Creek would modify the software and provide certain enhancements in order to make it marketable to prospective customers. Bear Creeks would market the software as modified under the name of Total Outside Plant Administration System ("TOPAS"). In addition to the need for documentation, the parties apparently recognized the need for, but did not commit to, live demonstrations or "site visits" so that prospective customers could see the system in action.(Doc. #111, Exh. 1, Dep. Franklin, pp. 114, 149-53; Exh. 5 Dep. Henderson, pp. 85-86). The parties' final agreement also included a merger clause which required all subsequent amendment to be in writing.(Doc. #111, Exh. 1, Def. Exh. 1).

### b. Development and Marketing of TOPAS

Bear Creek began marketing OSPCM in 1996. Bear Creek employed a staff whose job responsibilities were to put together presentation materials, marketing information and a list of sales prospects. On November 1, 1996, the company hired White, Brogdon's former boss who had been involved with the development of OSPCM. In late 1996, Bear Creek requested materials from BST which would enable it to market TOPAS. (Doc. #106, Exh. 7, Dep. White, p. 36). Many of BST's employees who were working on OSPCM in 1996-97 had worked for White and generally provided the materials as he requested. (Doc. #106, Exh. 7, Dep. White pp. 36-37). To prepare a sales and marketing presentation, BST allowed White on its premises at its offices at the Colonnade in Birmingham to capture screens and

build a 30-screen presentation on OSPCM with the Bear Creek's and TOPAS's logos on it. (Doc. #106, Exh. 7, Dep. White, p. 36). In addition, BST also provided White with screen captures of OSPCM's functionality and encoded engineering jobs on OSPCM for Bear Creek's demonstration and to assist with marketing. (Doc. #106, Ex. 7, Dep. White, p. 56). By the first quarter of 1997, Bear Creek had enough marketing materials to do a full PowerPoint sales presentation to U.S. West on TOPAS. In addition, Small, an employee of BST, testified that BST allowed site demonstrations of OSPCM on its premises where potential customers could view the software in an operating environment (Doc. #106, Exh. 5, Dep. Small, p. 15). Yet there were still some ambiguities regarding precisely what materials BST was required to provide. (Doc. #111, Exh. 5, Dep. Henderson, p. 107).

### c.    Oral Agreements

When the License Agreement was executed in June of 1996, Phase II (the largest part of OSPCM) was not finished and continued to undergo substantial changes. (Doc. #111, Exh. 5, Dep. Henderson, pp. 181-82; Exh. 1, Dep. Franklin, p. 119).[3] Bear Creek expended a substantial sum in fulfilling its end of the contract and became concerned that BST's attention appeared to be focused on other projects, essentially putting the dealings with Bear Creek "on hold." (Doc. #111, Exh. 3, Dep. Beckham, p. 116). At this time, Bear Creek alleges that BST became unresponsive to its requests to furnish materials, thereby putting Bear Creek in a "chokehold." (Doc. #111, Exh. 4, Dep. White, p. 155).  Bear Creek's representatives called Elton King ("King"), an executive at BST, complaining that "the corporate giant was killing the little contractor here for no reason at all." (Doc. #111, Exh.

---

[3] BST completely disputes any statement about the readiness of Phase II. (Doc. #114. p. 29)

4, Dep. White, pp. 146-47). In January 1997, at King's direction, BST's Hal Henderson ("Henderson") and Dick Franklin ("Franklin") held separate meetings with Bear Creek's representatives to discuss and resolve the issues. (Doc. #111, Exh. 4, Dep. White, p.164). Bear Creek alleges that the parties formed an oral agreement whereby Franklin promised to "do whatever it takes to make sure Bear Creek is successful with its marketing efforts." (Doc. #111, Exh. 1, Franklin Dep., pp. 147-53). Bear Creek claims that it changed its position in reliance on the promise, redoubling its marketing efforts. (Doc. #111, Exh. 6, Aff. Thompson , ¶ 3).

### d.    Bear Creek's Licensing Attempts

Bear Creek attempted to license TOPAS, its version of the OSPCM software, on several occasions. By November and into December 1997, U.S. West and Bear Creek were in the process of negotiating a contract. (Doc. #111, Exh. 2, Dep. Thompson, pp. 323-24). In January of 1998, Bear Creek's representatives met with U.S. West, but the server for OSPCM crashed shortly after the demonstration began. Bear Creek believes that BST withheld critical information regarding defects in the software, which prevented it from closing the sale. (Doc. #111, Exh. 2, Dep. Thompson, pp. 317-19). In April 1998, Bear Creek met with another serious prospective customer, SBC Communications, which was located in Shreveport. Prior to that visit, there was a dispute between BST and Bear Creek regarding additional terms to the License Agreement which resulted in Bear Creek agreeing to a change in the royalty structure. (Doc. #111, Exh. 9).[4] Bear Creek was unable

---

[4] BST indicates that there is no record evidence which supports the alleged circumstances leading to this change in the royalty structure. (Doc. #114, p. 40). Upon review of the evidence, however, the court finds that there is such evidence.

to close the sale in 1998 and shortly thereafter laid off a number of employees. Subsequently, Bear Creek met with BST's representatives to explore a potential investment by BST in Bear Creek. BST declined to make the investment and began to question whether Bear Creek's marketing efforts could be successful. (Doc. #111, Exh. 1, Dep. Franklin, pp. 226-28). During this same period, BST formed BIPMARK, which was headed by Carol Beckham ("Beckham"). The purpose of this company was to profit from selling or licensing BST's intellectual property, including OSPCM.

Despite the formation of BIPMARK, Bear Creek continued to market OSPCM. By October of 1998, it had generated interest in OSPCM from GTE, another telephone company.[5] After repeated attempts to schedule a site visit demonstration, Thompson met with Bechkam, who stated that BST was hesitant to set up the site meeting because previous visits had not panned out, and BST already had an existing relationship with GTE. (Doc. #111, Exh. 3, Dep. Beckham).[6] Thompson then brought his concerns to Dick Franklin ("Franklin") and Ken Satterfield ("Satterfield") of BST at a meeting on November 23, 1998. At that meeting Thompson asserted that he had by that time spent approximately a "life fortune" in connection with OSPCM. (Doc. #111, Exh. 1, Dep. Franklin, pp. 206-07). Thompson also inquired whether BST would attempt to sell software to prospects Bear Creek "brought to the table." BST indicated it would not. (Doc. #111, Exh. 1, Dep. Franklin, p. 212).

---

[5] Bear Creek disputes that GTE ever showed significant interest. (Doc. #114, p. 44).

[6] The specifics surrounding this site visit are disputed by both parties. BST contends it offered to host the site visit and provided support even though its contract did not obligate it to do so.

In 1999, U.S. West expressed renewed interest in purchasing the software. Bear Creek and U.S. West entered into an evaluation agreement under which U.S. West paid Bear Creek $300,000 to be credited against any purchase price for the software so that U.S. West could obtain and evaluate it. According to Thompson, U.S. West represented it would purchase the software for as much $11 million if it met the majority of Customer Evaluation Criteria listed in Section 5.0 of the evaluation agreement.[7] By June 10, 1999, six representatives of U.S. West had signed off on their internal Business Case approving the purchase of TOPAS, Bear Creek's name for and version of OSPCM. (Doc. #111, Exh. 30).

The next day, six representatives of U.S. West signed a Business Plan and apparently held a conference call with BST where the possibility of dealing directly with BIPMARK rather than Bear Creek was considered. (Doc. #111, Exh. 16). On June 23, 1999, negotiations between U.S. West and Bear Creek began again for a license fee; after a series of negotiations, Bear Creek made a final offer of $ 7.6 million for the license and required fees. (Doc. #111, Exh. 20 and 21). On July 6, U.S. West advised Bear Creek that it would be unable to accept Bear Creek's offer. In the meantime, however, Bear Creek alleges that U.S. West did not slow its use or evaluation of the software. (Doc. #111, Exh. 6, Aff. Thompson, ¶ 5). No proposals were exchanged between Bear Creek and U.S. West during the balance of July and August. Bear Creek alleges, however that BST was dealing with U.S. West. (Doc. #111, Exhs. 23 and 24).

---

[7] BST disputes that U.S. West ever actually intended to pay $ 11 million for the license. Bear Creek's basis for the fact comes from Thompson's knowledge as expressed in his affidavit. (Doc. #111, Def. Exh. 6, at ¶ 4). Bear Creek also cites to an affidavit from Laverne Wilaby, a representative of U.S. West, which indicates that a U.S. West internal document projected an $ 11 million payment for TOPAS licensing fees and maintenance costs. (Doc. #111, Wilaby Dep. at pp. 97-99). BST disputes that this payment was to be made to Bear Creek.

In August of 1999, BST arranged a site visit where U.S. West could see OSPCM.[8] U.S. West then decided to buy OSPCM and not TOPAS from Bear Creek. On September 1, 1999, U.S. West sent to Bear Creek a license agreement for the purchase of software for a price of $5 million. Bear Creek alleges that the negotiations resembled an ultimatum–if the offer was denied, U.S. West would buy directly from BST. (Doc. #111, Exh. 2, Dep. Thompson at p. 262). During this line of negotiations, U.S. West representatives were also talking with BST representative Beckham. (Doc. #111, Exh. 3, Dep. Beckham, p. 12). Bear Creek countered with an offer of $6,578,000, including 2 years of maintenance and U.S. West then renewed its initial offer of $5 million. (Doc. #111, Exh. 25).[9] Once again, Bear Creek rejected that offer. In the meantime, one of BST's representatives had dinner with an official from U.S. West. (Doc. #111, Exhs. 24 and 12). The next day, September 23, at 10:07 am, U.S. West e-mailed Thompson a final offer, which Bear Creek accepted. The sublicense was finalized and executed on October 7, 1999. Pursuant to the agreement's Payment Schedule, U.S. West is obligated to pay $5 million as various milestones are reached.[10] (Doc. # 106, Exh. 32). To date, Bear Creek has received all but $1.1 million. The License Agreement requires Bear Creek to pay BST $2.25 million in base royalties, plus 20% of any total fee for OSPCM. The License Agreement further requires Bear Creek to pay BST another $500,000 for each sale

---

[8] In a series of disputed facts, Bear Creek argues that this meeting was for the purpose of showing U.S. West the benefits of OSPCM and dealing with BIPMARK rather than with Bear Creek. (Doc. #111, Exh. 24 and 6, Thompson add., ¶ 6). BST disputes that the evidence supports this statement and the intent of the meeting. The court concludes that there are issues of fact to be determined at trial.

[9] BST disputes much of Bear Creek's characterization of the negotiation process. (Doc. #112, at p. 15).

[10] Ambiguities exist regarding the amount that Bear Creek was obligated to pay, Bear Creek contends the amount was $3,110,000. This argument will be addressed further in the memorandum.

of the navigator (a component of the OSPCM system). To date, Bear Creek has paid $300,000 to BST.

## III.   Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also DeJulio v. Georgia*, 276 F.3d 1244, 1248 (11th Cir. 2001). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001); *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)); *see also Comer, supra.*

11

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150); *see also Comer*, *supra*.

## IV.    Discussion

### a.    Choice of Law

Before considering the merits of each party's contentions, the court must first determine what law applies to each of BST's and Bear Creek's claims. In an action where jurisdiction is based upon diversity, the substantive law, including the choice of law rules of the forum state are applied. *Shaps v. Provident Life & Accident Insurance Co.*, 244 F.3d 876 (11th Cir. 2001). Under the terms of the Licensing Agreement, the parties determined

12

that the "construction, interpretation and performance of this Agreement shall be governed by laws of the State of Georgia." (Doc. #7, Def. Exh. 2 at ¶ 11.08).

In the first set of summary judgment briefs, the parties disputed what law should be applied to each claim. Bear Creek argued that Alabama law should apply for its tort and breach of contract and oral contract claims, while BST claimed that Georgia law should govern all contract claims. The second set of summary judgment briefs did not indicate that Bear Creek still claimed Alabama law applied for the oral contract claims.

### 1.    **Breach of Contract Claims**

The Alabama choice of law rules governing contracts require application of the law of the state chosen by the law of the jurisdiction where the contract was made, unless the parties manifest an intent to have some other law control. *J.R. Watkins Co. v. Hill*, 214 Ala. 507, 508 (1926). Since Georgia was named in the contract as the preferred choice of law, the court will apply it.

As a threshold matter, the court also believes Article 2 of the Uniform Commercial Code ("UCC") governs in the case. Although Georgia has not determined whether software licensing contracts are covered by the UCC, it has applied the UCC to software servicing contracts. *See Richard Haney Ford, Inc. v. Ford Dealer Computer Services*, 461 S.E. 2d 282, 284 (Ga. App. 1995); *see also NMP v. Parametric Technology Corporation*, 958 F. Supp. 1536, 1542 (N.D. Okla. 1997) (interpreting a software licensing agreement); *Micro Data Base Sys. Inc. v. Dharma Sys. Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (applying UCC to custom software contracts); *Colonial Life Ins. Co. v. Electronic Data Systems Corp.*, 817 F. Supp. 235, 238 (D. N.H. 1993) (applying the UCC to software licensing contracts); William D.

13

Hawkland *Hawkland Commercial Code Series* § 2-105:1 Goods Inclusions (2002) (noting the growing expansive definition of goods and noting that "[t]he basic test for distinguishing service contracts from contracts to sell specially manufactured goods is the same test that is used to distinguish contracts of service from contracts of sale namely a determination as to whether the service or sales aspect of the transaction is predominant."); Larry Lawrence, 12 Anderson on the Uniform Commercial Code, § 103:14 (2002 update) (noting that "[m]ost courts have treated a contract that includes both computer software and computer hardware as a sale of goods under Article 2 of the UCC."); Peter C. Quittmeyer, *Software Licensing*, 733 P.L.I. Understanding Intellectual Property License 279 (2003) (discussing Georgia law and noting that "the courts have found that the license of software can and should be treated as the sale of 'goods' covered by Article 2 of the UCC, whether directly or by analogy").

Generally the Georgia UCC applies if the "predominant element" of the contract deals with goods. *See* Ga. Code Ann. § 11-2-105 (2002) (defining scope of Article 2); *McCombs v. Southern Regional Medical Center, Inc.*, 504 S.E. 2d 747, 749 (Ga. App. 1998); *Heart of Texas Dodge, Inc. v. Star Coach, LLC*, 567 S.E. 2d 61, 64 (Ga. App. 2002) (noting the holding). That is:

> When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies even though a substantial amount of service is to be rendered in installing the goods. When, on the other hand, the predominant element of the contract is viewed as a service contract, the contract is viewed as service contract and the UCC does not apply. ... Factors to be considered in determining the predominant element of a contract include the proportion of the total contract cost allocated to the goods and whether the price of the goods are segregated from the price for services.

*D.N. Garner Co., Inc. v. Geogia Palm Beach Aluminum Window Corp.*, 504 S.E. 2d 70, 73 (Ga App. 1998) (citations omitted). The court's holding in *Ford Dealer Computer Services* provides little insight as to why it chose to apply the UCC. 461 S.E. 2d at 284. There, the court merely stated that the UCC applied to a contract which obligated a computer firm to provide hardware and software to assist its customer. *Id.* at 283.

In this case, the agreement required the plaintiff to provide "Materials" in the form of magnetic recording media so that the defendant could license and modify the software. (Doc. #109, Exh. 2). While the defendant merely committed to marketing and selling the materials, the transaction could not have occurred without the exchange of software. Thus, the sale of goods could fairly be considered the "predominant purpose" of the contract. *See Southern Regional Medical Center, Inc.*, 504 S.E. 2d at 749; *Star Coach, LLC*, 567 S.E. 2d at 64. For purposes of clarity and consistency, the court finds that the UCC should apply. Accordingly, the court holds that software licenses fall with in the purview of Article 2 of the UCC.[11]

In conclusion, the court will apply Georgia law to the parties' breach of contract claims and also will apply Article 2 of the UCC as it finds that the sale of goods is a "predominant purpose" of the contract.

---

[11]The court notes that this decision may be viewed by some as unorthodox. Regardless of whether the licensing code falls within the statutory scope of the UCC, the court does not think the application of the UCC materially changes the analysis other than to add clarity by means of statutory language.Where applicable, the court has also made reference to the Georgia state law regarding contract formation.

### 2.   Tort Claims

Although the Licensing Agreement does not contain a choice of law clause specifically covering tort claims, it does indicate that Georgia law will govern the agreement. Traditionally, the choice of law analysis applied in Alabama tort claims is *lex loci delicti*, or law of the place of the wrong. As one leading treatise explains "with rare exceptions, litigants may expect the application of *lex loci delecti* to be fairly predictable." Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort Law* § 39.0 (3rd ed. 2000); *see also Southern Railroad v. Carroll*, 11 So. 803 (Ala. 1892) (establishing the principle which has been followed in most circumstances since that time). In addition the parties do not contest the application of Alabama law to the tort claims. Accordingly, the court will apply choice of law principles where the underlying tort occurred for all of Bear Creek's counterclaims.[12]

### b.   Contract Claims

### 1.   License Fees

BST's claim arises from an ambiguity in the Payment Schedule between U.S. West and Bear Creek. Pursuant to its contract with Bear Creek, BST contends that it is due $5 million in licensing fees, while Bear Creek interprets the contract to mean that the BST is owed $3,110,000. The basis of the parties' dispute is a table in the Payment Schedule which Bear Creek contends calls for a lesser amount than the Payment Schedule's written text. The issue is significant because the amount U.S. West paid to Bear Creek in turn affects the amount

---

[12] The court notes that there is some support for applying Georgia contract law to torts arising directly from the contract. *See Deavors v. Southern Express Co.*, 76 So. 288 (Ala. 1917) ("If the action were for an independent tort, not related to or dependent upon the contract, to afford plaintiff a right of action, then of course the laws of Alabama [would apply]."). This case however, is dated and does not involve an express choice of law clause. Given Alabama's reluctance to deviate from *lex loci delecti*, the court will analyze the case under Alabama law.

that Bear Creek owes to BST. BST asks that the court grant summary judgment on the amount that Bear Creek owes, or, in the alternative, to grant summary judgment on the issue of liability. The original issue of liability between BST and Bear Creek, is not governed by the Payment Schedule between U.S. West and Bear Creek, but by the Licensing Agreement between Bear Creek and BST. The parties do not argue that there are any ambiguities in the Licensing Agreement, so the court grants summary judgment in favor of BST on the issue of liability. As the court is not granting the BST's motion for summary judgment on all claims, the award may be subject to offset and it will determine the amount that BST is due at trial.

### 2.      Breach of License

Bear Creek alleges that BST breached its license agreement by failing to deliver certain materials that Bear Creek needed to market the software  and failing to provide a "useable product."  BST argues that the contract did not obligate it to provide such a product, and, even if it did, the agreement contains a valid exculpatory clause which limits its liability. The court agrees with BST's argument that the license agreement's exculpatory clause governs these proceedings and thereby limits its liability.[13]

---

[13] Previously, Bear Creek's brief argued that the License Agreement did not apply to reliance damages. The court does not find this argument compelling; the agreement clearly states that BST will not be liable for any "incidental, special, direct, indirect or consequential loss or damage arising out of this agreement or any obligation resulting therefrom."  (Doc. # 7, Def. Exh. 2 at ¶ 9.01). Bear Creek, however, failed to cite any authority which would distinguish the reliance damages it seeks from the aforementioned types of damages. Georgia law has defined "direct damages" as "profits necessarily inherent in the contract." *Imaging Systems Int'l Inc. v. Magnetic Resonance*, 490 S.E.2d 124, 127 (Ga. App. 1997) (citations omitted). Special damages are those which flow directly from the breach such as expenses incurred at the breaching party's direction or as a consequence of the breach. *Id.* Even if the damages do not fit  into one of these two categories (which the court thinks is unlikely) the court finds they must fit in the garden variety of damages category for those damages "arising out of the agreement or resulting therefrom."  Accordingly, the court concludes that the License Agreement applies.

Georgia law, which governs the contract proceedings, allows parties to waive their rights freely. Recently the Court of Appeals stated, "Absent a public policy interest, contracting parties are free to contract to waive numerous and substantial rights, including the right to seek recourse in the event of breach by the other party." *Flanigan v. Executive Office Centers, Inc.*, 546 S.E.2d 559, 561 (Ga. Ct. App. 2001) (citations omitted); *Imaging Systems International, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E. 2d 124 (Ga. Ct. App. 1997) (noting absent public policy interest, contracting parties are free to contract to waive numerous and substantial rights including right to seek recourse in the event of breach by other party); *see also Orkin Exterminating Co., Inc. v. Stevens*, 203 S.E. 2d 587, 592-93 (Ga. Ct. App. 1973) (interpreting Georgia common law of contracts and noting that it allows parties to freely waive their rights); *CGU Life Ins. Co. v. Songer Asset Finance Co., LLC*, 553 S.E. 2d 8, 13 (noting the contined viability of *Orkin*). So long as the clause is "explicit, prominent, clear and unambiguous" it will be upheld. *International Imaging*, 490 S.E. 2d at 644-45. The chief exceptions to this rule arise if the contract is either unconscionable or procured by fraud–neither of which is the case here. *See* Ga. Code Ann. § 11-2-302 (2002) (contracts which are unconscionable may be enforced or the court may limit its application).[14]

---

[14]As with the waiver of liability, the analysis is generally the same under the Georgia common law, although some Georgia courts have drawn a distinction between UCC/common law unconscionability, but as one court noted it did not perceive "a noticeable difference in the standards and procedures for unconscionability in and out of the Article 2 context." *See Garbutt v. Southern Clays, Inc.*, 894 F. Supp. 456, 463 (M.D. Ga. 1995).

In their reply brief, Bear Creek did not argue that the exculpatory clause was unconscionable.[15] Instead, it claimed the disclaimer provision was inapplicable because their action was for breach of *contract* and not *warranty*. In *Richard Haney Ford Inc. v. Ford Dealer Computer Services,* the court explained the grounds for a breach of contract claim. 461 S.E.2d 282 (Ga. Ct. App, 1995). There, the plaintiff ordered software and supporting materials and the defendant delivered a defective product. *Id.* at 284-86. The court found that "an obligation of the seller may be stated in the form of a collateral warranty, a warranty implied by law, or in 'adjective form as part of the description of the goods.'" *Id.* at 285 (quoting 5 Williston on Contracts (3rd ed.), § 705)[16].

Although the court finds a cause of action could lie for breach of contract, the exculpatory clause serves as a valid limitation on BST's liability. *Flanigan v. Executive Office Centers, Inc.*, 546 S.E.2d 559, 561 (Ga. Ct. App. 2001). The License Agreement's disclaimer explains in clear, specific, and visible terms that Plaintiff is "not liable to licensee,

---

[15] The court notes that even if they had raised it, it would disagree. *See Mullis v. Speight Seed Farms, Inc.*, 505 S.E. 2d 818, 819 (Ga. App. 1999). In *Mullis*, the court noted that unconscionability was a flexible doctrine which should be applied based on the "age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the terms, and the presence or absence of a meaningful choice." *Id.* at 820. There the court found the disclaimer to be unconscionable because the plaintiff was a farmer who handled the transaction over the phone and was not expected to be in a sophisticated bargaining position. *Id.* Here the court finds that both parties were sophisticated and possessed the relevant bargaining power to move forward.

[16] Bear Creek vehemently contends that BST breached the duty to perform the contract in good faith. BST maintains, however, that a party cannot recover for a breach of an implied covenant of good faith unless the plaintiff can also recover for breach of an express covenant. *See Stuart Enterprises International, Inc. v. Peykan, Inc.*, 555 S.E. 2d 881, 884-85 (Ga. App. 2001). Although this is a correct statement of the law, under the law as stated in *Richard Haney Ford, Inc. v. Ford Dealer Computer Services*, 461 S.E.2d 282 (Ga. App. 1995), it appears that breach of contract might create an express covenant which would trigger the implied duty of good faith and fair dealing. Nevertheless, the court finds that this claim is also covered by the valid liability disclaimer. Furthermore, the court notes that the *Peykan* case also indicated that the holding stands for both Article 2 and common law contracts. 555 S.E. 2d at 884-85.

consultants... or to any person or entity using the materials, in whole or in part. ... whether in an action for or arising out of alleged breach of warranty, alleged breach of contract, delay negligence ..." (Doc. #111, Exh. 1, Def. Exh. 1). Since Bear Creek has not proven that the clause was either unconscionable or procured by fraud, the court finds that there is no reason to doubt either its validity or its applicability. *International Imaging*, 490 S.E. 2d at 644-45. Accordingly, the court holds that the parties knowingly exercised their right under Georgia law to waive liability on this issue.

In conclusion, the court grants summary judgment in favor of BST on Bear Creek's claim for breach of license agreement and/or breach of contract on the grounds that the parties executed a valid limited liability clause.

### 3.    Breach of Oral Contract

Bear Creek alleges that BST made an oral commitment to fully support Bear Creek in its marketing efforts. In effect, the claim alleges a breach of an oral modification to the Licensing Agreement. Consistent with its earlier discussion, the court will apply Georgia law to this claim (the UCC).[17] The decision follows from the fact that the parties agreed that their written contract would be interpreted under Georgia law and because any oral agreement upon which Bear Creek relies was, at least in subject matter, related to the original written contract. Moreover, in the most recent round of briefs, the court specifically asked the parties to indicate what law applies and Bear Creek has cited no caselaw at all on the issue – much less any which would indicate the court should apply any law other than that from

---

[17]As noted in the opinion the UCC liberalized common law requirements regarding formal contract requirements. Moreover analysis of UCC requirements includes a discussion of the common law. *See* discussion *infra.*

Georgia.[18] BST alleges that the oral contract cannot be enforced because it is indefinite, it is not in writing and it falls within the Statute of Frauds, and the written contract between the parties contained a valid merger clause which required all oral modifications to be in writing. The court will address each claim in turn.

Under Georgia law, "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Ga. Code Ann. § 11-2-204(1) (2002). The Code further provides that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Ga. Code Ann. §11-2-204(3) (2002). The Georgia Courts have found that although the UCC liberalized the formal contract requirements, common law principles are still applicable in determining issues of formation. *See Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*, 458 S.E.2d 170 (Ga. App. 1995). In *Sero-Immuno-Diagnostics*, the court found that the "gap filler" provisions of the UCC did not eliminate the common law requirement of a "meeting of the minds." As the court explained, "the agreement must be expressed plainly and explicitly enough to show what the parties agree[d] upon; a contract cannot be enforced if its terms are incomplete or incomprehensible." *Id.* at 171 (citing *Hughes v. McMichen*, 296 S.E.2d 233 (Ga. App. 1982)). Likewise, "if it cannot be determined what the parties intended, it cannot be determined what is a breach, or what is an appropriate remedy." *Sero-Immuno Diagnostics, Inc.*, 458

---

[18]In the previous set of briefs, however, Bear Creek claimed that Alabama law should apply. The court has not detected any meaningful differences between Alabama and Georgia law on this issue.

S.E. 2d at 171; *see also See, e.g. American Viking Contractors, Inc. v. Scribner Equipment Co., Inc.*, 745 F.2d 1365, 1369-70 (11th Cir. 1984) (applying Georgia law and affirming summary judgment due to the indefinite nature of the promise); *American Equipment Services, Inc. v. Evans Trailer Leasing Co.*, 650 F. Supp. 1266, 1269-72 (N.D. Ga. 1986) (alleged oral covenant not to compete was never more than an agreement to agree thus not sufficiently definite to constitute a contract); *Cherokee Falls Investments, Inc. v. Smith* 445 S.E.2d 572 (Ga. Ct. App. 1994) (invalidating a contract because it lacked specificity regarding what the parties were obligating themselves to do); *Cochran v. Ogletree*, 536 S.E.2d 194, 196  (Ga. Ct. App. 2001)(noting that a contract may be considered void for vagueness); *Contract Sales & Service Int'l, Inc. v. American Express Travel Related Services Co.*, 453 S.E.2d 62 (Ga. Ct. App. 1995) (noting "in addition any of the parties' negotiations concerning future liquidation of inventory are too indefinite for enforcement and at most, represent an unenforceable agreement to agree."); *Valuejet Airlines, Inc. v. TransWorld Airlines, Inc.*, 1995 WL 888551 (N.D. Ga. 1995) (using the case to support a decision not to give effect to an indefinite contract). *Jackson v. Williams*, 434 S.E.2d 98, 100 (Ga. App. 1993) ("The requirement of certainty extends not only to subject matter and purpose of the contract but also to the parties, consideration, and even the time and place of performance where these are essential. When a contract is substantially alleged, some details might be supplied under the doctrines of reasonable time or reasonable requirements. But indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void ...").

More specifically, in *Drug Line Inc. v. Sero-Immuno Diagnostics, Inc.*, the court attempted to interpret a contract to market distribution of an HIV test kit. 458 S.E. 2d at 170. The court found an ambiguity in the first line of the contract because it required the company to "upgrade the facilities." *Id.* The court found the term lacking because it called for conjecture and for a potentially indefinite obligation. *Id.*

Bear Creek contends that the original written contract between BST and Bear Creek was ambiguous on a number of terms, such as the types of materials that BST was to provide, when they were to provide them and whether the company would support site visits. Once BST had the company in a "chokehold" the parties needed to clarify the agreement or abandon it. At a meeting in January 1997, Franklin, a representative from BST indicated that he was "ready to do whatever it takes to make sure Bear Creek is successful with its marketing efforts on TOPAS." (Doc. # 111, Exh. 1, Franklin Depo. pp. 149-53). Also at this meeting it was determined that "Bear Creek will get any necessary data, software, documents, or any other stuff necessary to market and sell TOPAS through the existing license agreement." (Doc. #111, Exh. 1, Franklin Depo., pp. 149-53). They further decided that Bear Creek would receive "deployment check lists, schedules, training documentation and access to the OSPCM training database." (Doc. #111, Exh. 1, Franklin Depo., pp. 149-53).

Although this information is more definite than the Licensing Agreement, it does not provide details which are specific enough to constitute a binding and enforceable contract. The thrust of the promise was that BST would fully support Bear Creek's marketing efforts. While the internal memorandum cited by Bear Creek does list various materials that would

amount to full "support," the court still finds the term to be, at best, highly imprecise. It would be impossible for the court to grant relief in this case because it could not determine what exactly the parties agreed upon. *Sero-Immuno Diagnostics, Inc.*, 458 S.E. 2d at 171. Bear Creek has failed to show how BST could have ensured its success or how the court can do so now. It is unfortunate that Bear Creek may have been confused, misled or even duped by the meeting, but its reliance on the outcome and expenditure of thousands of dollars was nonetheless highly misplaced.

Even if the contract could somehow be considered sufficiently definite, the court would still grant summary judgment because the "contract" would be void under the statute of frauds. In addition, the merger clause bars Bear Creek from prevailing on any additional contract claim. The Georgia Statute of Frauds requires any contract that cannot be performed in one year to be in writing. Ca. Code. Ann. § 11-2-201(1) (2002). According to the written contract, Bear Creek had an obligation to market BST's product until June 14, 2000. Thus, any statement by Franklin would have obligated Bear Creek until June 14 – a date which is more than a year after the inception of the alleged oral contract. Although Bear Creek maintains that issues of fact exist regarding whether BST could have met its obligations within one year, and also contends that the agreement was ratified in a nearly contemporaneous written memorandum, the court finds neither argument compelling. The memorandum referred to by Bear Creek is indefinite about the length of time BST would support Bear Creek and the court finds any reliance on it to be, at best, circumspect. Accordingly, the court grants summary judgment on this issue.

24

Likewise, also under Georgia law, if the parties reach a written agreement regarding a subject, and if that agreement includes a merger clause, then one party cannot subsequently recover for breach of an alleged oral agreement regarding the subject matter treated in the written agreement. *Dixie Aluminum Products Co., Inc. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 160 (N.D. Ga. 1992) (interpreting Georgia law and holding that a valid merger clause was binding on the parties); *see also Kassinger, Inc. v. Steimer*, 422 S.E.2d 241, 242-43 (Ga. App. 1992) (holding that an oral contract was unenforceable where the parties entered into subsequent written agreements containing merger clauses). Here, the original contract contained a valid merger clause and the parties entered into at least one other subsequent written agreement. In that agreement, BellSouth agreed to accept a reduced royalty if Bear Creek sold a license for OSPCM to Cincinnati Bell. There is no question that the merger clause was valid and, although the written amendment was executed after the alleged oral agreement, that the parties executed subsequent oral modifications. Accordingly, Bear Creek cannot rely on an oral contact as an amendment to the written contract.

In conclusion, the court grants the BST's motion for summary judgment on Bear Creek's breach of oral contract claim because the court finds that the contract is indefinite, it violates the Statue of Frauds, and it is void in the face of a valid merger clause.

**c.    Tort  Claims**

Unlike Bear Creek's contract claims, the court does not find that its tort claims for fraudulent suppression and intentional interference with business relations are barred by the exculpatory clause in the contract. As explained *supra* the court applies Georgia law for

disputes regarding the contract in this case. Although the liability clause is a veritable laundry list of excludable claims, the court finds that under Georgia law negligence disclaimers do not necessarily exclude liability for intentional torts. *See Barbazza v. International Motor Sports Association, Inc.*, 538 S.E.2d 859 (Ga. Ct. App. 2000) (holding that a negligence release did not relieve defendant for acts of willful misconduct or gross negligence); *Wade v. Watson*, 527 F. Supp. 1049 (N.D. Ga. 1981) (same); *see generally* 57A *AmJur.2d Negligence* § 55 (1989) ("Courts are generally agreed that by use of exculpatory language, one may not exonerate himself from liability for intentional torts, for wilful or wanton misconduct, or for gross negligence."). Accordingly, the court will permit consideration of Bear Creek's tort claims and will analyze them under Alabama law.

### 1.    Fraudulent Suppression

A cause of action for fraudulent suppression has four basic elements: (1) the existence of a duty to disclose; (2) the suppression of material facts known to the defendant; (3) inducement to action or failure to act on the part of the plaintiff; and (4) damages. *State Farm Fire & Casualty Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1999); *Booker v. United American Ins. Co.*, 700 So.2d 1333, 1339 (Ala. 1997). Bear Creek contends that a jury could reasonably find that BST suppressed three categories of facts: (1) the true condition of OSPCM during a critical period in Bear Creek's marketing efforts; (2) BST's internal decision to no longer support Bear Creek's marketing efforts; and (3) BST's direct dealings with Bear Creek's prospective customer, U.S. West.

A duty of disclosure sufficient to support a fraudulent suppression claim may arise from confidential relations between the parties or from the particular circumstances of the

case. Ala. Code § 6-5-102 (1975). Such particular circumstances include the relationship

between the parties, the relative knowledge of the parties, the value of the particular fact

suppressed, the plaintiff's opportunity to discover the facts suppressed, the circumstances

of the trade, and other relevant circumstances. *State Farm*, 729 So. 2d at 842-32 (Ala. 1999).

In *State Farm*, the Alabama Supreme Court explained "whether a duty [to disclose] exists

is a mixed question of law and fact." *Id.* at 839. Under the special circumstances approach,

the jury determines the disputed facts upon which the alleged duty rests, and the court

"instruct[s] the jury as to what that duty would be if these circumstances did exist." *Id.* at

840. Summary judgment is appropriate only if the court, "assuming as truth all of the

plaintiff's factual assertions" determines that no duty could exist as a matter of law. *Id.*

Where the parties are in a commercial relationship the analysis changes. As the Alabama

Supreme Court has explained "[i]n commercial transactions involving parties to arm's length

negotiations, however, a bright line rule generally applies: the parties have no general

obligation to disclose, but each was an affirmative duty to respond 'truthfully and accurately'

to direct questions from the other." *Shutter Shop, Inc. v. Amersham Corp.*, 114 F. Supp. 2d

1218, 1215 (M.D. Ala. 2000) (citing *Ex parte Ford Motor Credit Co.*, 717 So. 2d 781, 787 (Ala.

1997)); *see also Danley v. Murphy*, 658 So. 2d 483, 486 (Ala. Civ. App. 1994) (noting that in

commercial settings "the party is under a duty to make a full and fair disclosure, without

suppressing or concealing any material facts of which [it] had knowledge."). Nevertheless,

a commercial relationship is not a death knell to a fraudulent suppression claim. As Alabama

court's have shown, the inquiry is fact intensive and if the *State Farm* factors suggest that

such a claim is present, the commercial nature of the parties relationship will not always

27

prevent a claim from going forward. *See, e.g. Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 2000) (allowing a fraudulent suppression claim for claim involving purchase of a marine vessel where buyer's knowledge was of critical importance); *Deupree v. Butner*, 522 So. 2d 242, 245 (Ala. 1988) (allowing claim where purchaser bought house contingent on belief that a boat slip license could be obtained); *Shutter Shop v. Amersham Corp.,* 114 F. Supp. 2d 1218, 1225 (M.D. Ala. 2000) (applying Alabama law and noting that though there was no general obligation to disclose in arms-length transactions that each party was an affirmative duty to respond "truthfully and accurately" to direct questions).

BST argues that it had no duty to disclose anything to the plaintiff because it dealt with it in a commercial setting and at arms-length. *Shutter Shop*, 114 F. Supp. 2d at 1225. It maintains that the written contract defined the rights and obligations of the parties. For example, the contract provided that OSPCM is provided "as is" and that Bear Creek would delivered the product when Bear Creek produced a letter of intent. Moreover, the contract does not include a statement that the company was obligated to support  Bear Creek. Bear Creek by contrast maintains that there are both incident of (1) direct inquiry and (2) particular circumstances which justify denial of summary judgment and the court agrees.

As previously stated, a commercial, contractual relationship will not prevent every fraudulent suppression claim from moving forward. For example, in *Bethel v. Thorn*, the Alabama Supreme Court allowed a commercial claim to survive summary judgment where a buyer was purchasing a boat and had (1) pre-paid the total purchase price; (2) the defendant was aware of particular circumstances which were important to the plaintiff and (3) the defendant made representations regarding his ability to deliver the product which

28

precluded the plaintiff from making alternative arrangements. 757 So. 2d 1154, 1161-62 (Ala. 2000). The court centered its focus on the dependence of the buyer on the seller's information. *Id.* This situation is not dissimilar; as a small, independent contractor, Bear Creek was dependent on the information and support of BST, a large conglomerate with a virtual monopoly over the product. Though BST cites to the technical terms of the contract – in practical terms, the contract required Bear Creek to expend substantial time and resources marketing a complex, multimillion dollar product with a sales cycle of over a year. Thus, at each step,  Bear Creek was relying on a product of which BST had exclusive knowledge and expertise. This knowledge and expertise covered both the makeup of the product itself and the ability that Bear Creek would have to market it.

Assuming, without deciding, that the parties establish enough evidence to establish that there was a duty to disclose, the question remains whether the suppression could have reasonably induced the parties to act. The gravamen of Bear Creek's argument is that BST did not act in good faith when it failed to keep the company sufficiently informed of the OSPCM during its marketing efforts, in its decision not to support Bear Creek's marketing efforts and in its dealings with U.S. West. BST, by contrast, points to the written contract noting that it did not require the disclosures.

Generally, "a purchaser is not authorized  to disregard the express terms of a written contract and rest a claim on fraud, claiming only that he relied on a statement contrary to the contract terms. The purchaser's reliance upon a contract statement, even if the statement is false, must be 'reasonable' under the circumstances, before the law will require the speaker to respond in damages for fraud." *Alpine Bay Resorts, Inc. v. Wyatt*, 539

So. 2d 160, 163 (Ala. 1989) (citing *Webb v. Reese*, 505 So. 2d 321 (Ala. 1987)). BST analogizes this case to the Alabama case, *Foremost Ins. Co. v. Parham*, 693 So. 2d 409 (Ala. 1997) where the court found that a party could not reasonably rely on express oral misrepresentations contradicting a written agreement – here, they maintain that a party cannot reasonably rely on silence to draw inferences directly contradicted by the licensing agreement. Moreover, they maintain that any unspoken understanding between the parties cannot be the basis for a fraudulent suppression claim because the implied covenant of good faith and fair dealing is not an independent cause of action under Georgia law. *See Stuart Enterprises International, Inc. v. Peykan, Inc. v. Peykan*, 555 S.E. 2d 881, 883-84 (Ga. App. 2001).

In *Stuart Enterprises International*, the plaintiff's cause of action arose not from an express term in the contract, but from the implied covenant of good faith and fair dealing. The court explained that "[t]he 'covenant' not to perform  in good faith] is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*." *Id.* (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429(IV) (11th Cir. 1990)). Reviewing the jury award for breach of contract, the court held "the jury found that there was no breach of contract, but returned a verdict based solely on a claim for the breach of the covenant of good faith in the performance of that contract. Inasmuch as such a breach cannot form the basis of an independent cause of action, this verdict cannot stand." *Id.*

It appears to the court in this case that allowing a cause of action for fraudulent misrepresentation would in fact create an independent cause of action for terms not

30

explicitly spelled out in the contract. BST specifically declined to make the contract exclusive and their actions did not amount to a breach of contract. Thus, Bear Creek's reliance on BST's statements and their expectation that they would be fully informed was not reasonable. Although the court thinks that morally, BST's actions were reprehensible, such reprehensibility does not necessarily lead to a legal cause of action.

### 2. Intentional Interference with Business Relations

Bear Creek alleges that BST tortiously interfered with Bear Creek's business relations. In particular Bear Creek claims that BST advised U.S. West that BST was willing to license OSPCM directly to U.S. West while Bear Creek was attempting to negotiate with U.S. West. To have a claim for intentional interference with business relations, Bear Creek must establish: (1) the existence of a contract of business relation; (2) defendant's knowledge of the contract of business relation; (3) intentional interference by the defendant with the contract or business relation; (4) absence of justification for the defendant's interference; and (5) damages to the plaintiff as a result of the interference. *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590, 597 (Ala. 1986) (citing Restatement (Second) of Torts § 767 (1977). A cause of action will not lie however, if the alleged interferor is a party to the contract. *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 2001 WL 564264 (Ala. 2001). In *BellSouth* the Alabama Supreme Court noted "it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered. *Id.* (quoting *Atlanta Market Ctr. Management Co. v. McLane*, 269 Ga. 604, 608 (Ala. 1998); *Bama Budweiser v. Anheuser-Busch Inc.*, 611 So. 2d 238 (Ala. 1992); *see also Cahaba Seafood Inc. v. Central*

*Bank,* 567 So. 2d (Ala. 1990) (holding that there is no intentional interference where a contract is breached between two parties that incidentally affects another contract).

BST contends that summary judgment is appropriate because: (1) like the Plaintiff in *BellSouth,* it had the contractual right to sell to U.S. West; (2) its privity to the contract precludes the suit; and (3) the remedy is inappropriate because the underlying cause of action involves a breach of contract rather than a separate claim of action for business relations. The court disagrees with BST on all counts. The court sees meaningful distinctions between both cases that BST uses to advance its claims – namely *BellSouth* and *Cahaba Seafood*–and is persuaded that there are issues of fact particularly regarding whether BST breached unwritten rules of business ethics. Accordingly the court denies BST's request for summary judgment on this issue.

In conclusion, the court denies BST's motion for summary judgment on Bear Creek's claim for intentional interference with business relations.

### C. Offset

In the first, though not the second set of briefs, Bear Creek alleges that the court should allow it to offset any damages it receives from the suit. BST, on the other hand argues that the valid exculpatory clause present in its licensing agreement limits its liability altogether. This may be the case, however until such damages are set, the court agrees with Bear Creek's explanation of offset as explained in *Head v. Southern Development Co.,* 614 So. 2d 1044, 1047 (Ala. 1993):

> [Set-off] is based on principles of right, justice, and
> benevolence. The right of set-off which is essentially a doctrine
> of equity , is based on the principle that natural justice and

> equity require that the demands of parties mutually indebted be
> set off against each other and that, in a judicial proceeding by
> one against the other, only the balance should be recovered.

*Id.* at 1047.

Accordingly, even though the court finds that Bear Creek owes BST

money under the Licensing Agreement, it will allow the case to proceed to trial and will

allow a jury to determine the issue of liability once it has heard Bear Creek's tort claim.


**V. Conclusion**

The court will enter an order in conformity with this memorandum of opinion.


Done, this _____ of June, 2003.


L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

33